FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

OCT 1 3 2015

Judge Edmond E. Chang
United States District Court

UNITED STATES OF AMERICA

v.

BARBARA BYRD-BENNETT

No. 15 CR 620

Hon. Edmond E. Chang

## PLEA AGREEMENT

1.     This Plea Agreement between the United States Attorney for the Northern District of Illinois, ZACHARY T. FARDON, and defendant BARBARA BYRD-BENNETT, and her attorney, MICHAEL Y. SCUDDER, JR., is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(c)(1)(A), as more fully set forth below. The parties to this Agreement have agreed upon the following:

## Charges in This Case

2.     The indictment in this case charges defendant with honest services wire fraud, in violation of Title 18, United States Code Sections 1343 and 1346 (Counts 1-4, 6), and honest services mail fraud, in violation of Title 18, United States Code, Sections 1341 and 1346 (Counts 5, 7-20).

3.     Defendant has read the charges against her contained in the indictment, and those charges have been fully explained to her by her attorney.

4.     Defendant fully understands the nature and elements of the crimes with which she has been charged.

## Charge to Which Defendant Is Pleading Guilty

5.    By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the following count of the indictment: Count Two, which charges defendant with honest services wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346.

## Factual Basis

6.    Defendant will plead guilty because she is in fact guilty of the charge contained in Count Two of the indictment. In pleading guilty, defendant admits the following facts and that those facts establish her guilt beyond a reasonable doubt, and constitute relevant conduct pursuant to Guideline § 1B1.3:

BYRD-BENNETT was employed as a consultant with the Chicago Public Schools from approximately May 1, 2012 until October 12, 2012, when she became the Chief Executive Officer and General Superintendent of CPS. She was an agent of CPS during the entirety of her employment with CPS. She owed a duty of honest services to CPS and the Board of Education of the City of Chicago in the performance of her public duties. BYRD-BENNETT understood that she could not have an economic interest in any vendor contracts with the CBOE once she became a consultant for CPS. She also understood that she could not receive any private or financial benefits for herself or her family in connection with any vendor contracts with CPS.

Gary Solomon and Thomas Vranas owned and operated The SUPES Academy, LLC, and Synesi Associates, LLC (collectively, the "SUPES Entities"), which offered education-related services to the public education industry. From approximately the summer of 2011 until approximately April 30, 2012, BYRD-BENNETT was a paid consultant for the SUPES Entities.

In or about December 2011, Solomon, Vranas, and The SUPES Academy, LLC entered into a contract with Organization A to provide a leadership development program for CPS network chiefs, which program became known as the Chicago Executive Leadership Academy, or CELA. From approximately December 2011 until approximately July 2012, CELA was funded by a grant of approximately $380,000 from Organization A and approximately $25,000 from CPS. BYRD-BENNETT served as Master Teacher and coach for CELA.

Beginning no later than in or about April 2012, and continuing until at least April 2015, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, BYRD-BENNETT, together with Solomon, Vranas, and the SUPES Entities, knowingly devised, intended to devise, and participated in a scheme to defraud and to obtain money and property from CPS by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, and to defraud and deprive CPS and the Chicago Board of Education of their right to the honest services of BYRD-BENNETT through bribery and kickbacks.

3

Specifically, BYRD-BENNETT solicited and agreed to accept bribes and kickbacks in the form of personal financial benefits from and future employment with Solomon, Vranas, and the SUPES Entities, in exchange for acts in BYRD-BENNETT's official CPS capacity that were designed to promote and bring about the awarding of CPS contracts to the SUPES Entities.

In April and May of 2012, Vranas, on behalf of Solomon and the SUPES Entities, and BYRD-BENNETT executed a Consulting Agreement in which Solomon, Vranas, and the SUPES Entities agreed to give BYRD-BENNETT a percentage of the gross revenues of any contracts awarded to the SUPES Entities if, among other things, BYRD-BENNETT provided sales services for the contract. BYRD-BENNETT understood that such contracts included those to be awarded by CPS.

BYRD-BENENTT performed acts in her official CPS capacity in order to promote and bring about the awarding of CPS contracts to the SUPES Entities. Among other things, BYRD-BENNETT introduced Synesi Employee A to CPS employees to plan for external school diagnostic reviews and falsely represented that she was receiving no financial benefit from the use of the diagnostic review. BYRD-BENNETT provided information to Solomon and Vranas regarding Requests for Proposals to be issued by the CBOE in an effort to give the SUPES Entities an advantage over their competitors. BYRD-BENNETT also persuaded Vendor A,

4

which operated alternative schools within CPS, to serve as a sponsor for The SUPES Academy in August 2012.

Throughout the summer and fall of 2012 and in her official CPS Capacity, BYRD BENNETT participated in a number of meetings with representatives of Organization A, where she presented her idea to further expand CELA to include school principals for the 2012-2013 school year. BYRD-BENNETT repeatedly requested funding from Organization A to fund CELA for the 2012-2013 school year and its expansion to principals. At Solomon's direction, BYRD-BENNETT asked Official A to request funding from Organization A for CELA and its expansion. BYRD-BENNETT directed CPS employees to identify funding within CPS to cover the costs of an expansion of CELA and to steer contracts for The SUPES Academy through the CPS procurement process in 2012 and 2013.

On or about October 24, 2012, the CBOE approved a $2.09 million, sole-source contract for The SUPES Academy for leadership development services, including an expansion of CELA to principals. Under the terms of her Consulting Agreement, BYRD-BENNETT understood that Solomon, Vranas, and the SUPES Entities would pay her 10% of the gross value of the October 24, 2012 contract.

In her official CPS capacity, BYRD-BENNETT directed additional expansions of CELA and requested funding for and CBOE approval of contracts for The SUPES Academy, including (1) a $225,000 settlement payment to The SUPES Academy, which was approved by the CBOE on or about January 23, 2013; (2) a $225,000

contract extension of the October 24, 2012 contract, which was approved by the CBOE on or about January 23, 2013; and (3) a $20.5 million sole-source contract for leadership development services, which was approved by the CBOE on or about June 26, 2013.

BYRD-BENNETT understood that Solomon, Vranas, and the SUPES Entities created and funded financial accounts for the benefit of Relative A and Relative B of BYRD-BENNETT. Based on her conversations and communications with Solomon, BYRD-BENNETT understood that these accounts contained payments owed to BYRD-BENNETT, pursuant to her Consulting Agreement, for her official actions at CPS leading to the award of the October 24, 2012 contract to The SUPES Academy, as well as contracts awarded by other school districts to the SUPES Entities.

BYRD-BENNETT eventually understood that Solomon, Vranas, and the SUPES Entities intended to hold the payments for her official actions leading to the October 24, 2012 contract and pursuant to the concealed Consulting Agreement until after her employment with CPS ended and to make these payments a "signing bonus" upon her return to employment with the SUPES Entities. Solomon told BYRD-BENNETT that the accounts for Relative A and Relative B contained approximately $127,000 each, which funds represented approximately 10% of the gross proceeds of the October 24, 2012 contract, in addition to funds the SUPES Entities owed to BYRD-BENNETT for work performed in other school districts prior to her employment with CPS.

6

BYRD-BENNETT did not receive any payments from Solomon, Vranas, or the SUPES Entities or any trust relating to the SUPES contracts while employed at CPS or thereafter. Instead, BYRD-BENNETT expected to receive, following her employment with CPS, (1) employment with the SUPES Entities; (2) financial accounts for Relative A and Relative B; and (3) a signing bonus consistent with those received by other superintendents when they became consultants, and thus worth hundreds of thousands of dollars.

BYRD-BENNETT also accepted numerous items of value from Solomon, Vranas, and the SUPES Entities, such as basketball tickets, baseball tickets, meals, and other personal items in exchange for BYRD-BENNETT using her official CPS position to ensure that the SUPES Entities kept and expanded their contracts with CPS and obtained additional contracts with CPS in the future.

BYRD-BENNETT, Solomon, Vranas, and the SUPES Entities concealed the Consulting Agreement and BYRD-BENNETT's continued financial interest in the SUPES Entities from CPS and the CBOE. In particular, Solomon and the SUPES Entities provided a letter to BYRD-BENNETT that falsely purported to terminate her Consulting Agreement with The SUPES Academy effective April 30, 2012. BYRD-BENNETT also falsely represented in her Statement of Financial Interests filed with the CBOE each year from 2012 through 2014 that the CBOE did not award any work, business or contracts to any person or entity in which she or a relative had an economic interest.

7

BYRD-BENNETT, Solomon, Vranas, and the SUPES Entities concealed, misrepresented and hid, and caused to be concealed, misrepresented and hidden, the existence and purpose of the scheme, and acts done in furtherance of the scheme.

On or about June 15, 2012, in the Northern District of Illinois, Eastern Division, and elsewhere, BYRD-BENNETT, together Solomon and Vranas, for the purpose of executing the above-described scheme, knowingly caused to be transmitted by means of a wire communication in interstate commerce, certain signs, signals and sounds, namely, an email from BYRD-BENNETT to Solomon, with a copy sent to Vranas, containing an email chain with a discussion of an expansion of CELA and stating, in part, "I will work hard to get us this and expanded work[,]" in violation of Title 18, United States Code, Section 1343 and 1346.

7.    The foregoing facts are set forth solely to assist the Court in determining whether a factual basis exists for defendant's plea of guilty, and are not intended to be a complete or comprehensive statement of all the facts within defendant's personal knowledge regarding the charged crimes and related conduct.

<u>Maximum Statutory Penalties</u>

8.    Defendant understands that the charge to which she is pleading guilty carries the following statutory penalties:

8

a.      A maximum sentence of 20 years' imprisonment. This offense also carries a maximum fine of $250,000, or twice the gross gain or gross loss resulting from that offense, whichever is greater. Defendant further understands that the judge also may impose a term of supervised release of not more than three years.

b.      Defendant further understands that the Court must order restitution to the victims of the offense in an amount determined by the Court.

c.      In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on the charge to which she has pled guilty, in addition to any other penalty or restitution imposed.

<u>Sentencing Guidelines Calculations</u>

9.      Defendant understands that in imposing sentence the Court will be guided by the United States Sentencing Guidelines. Defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

10.     For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

a.      **Applicable Guidelines.** The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual that will be in effect as of November 2015.

9

b.    **Offense Level Calculations.**

i.    The base offense level is 14, pursuant to Guideline § 2C1.1(a)(1), because defendant was a public official.

ii.    Pursuant to Guideline § 2C1.1(b)(2), because the value of the property obtained exceeded $5,000, the base offense level is increased by the number of levels from the table in Guideline § 2B1.1. Pursuant to Guideline § 2B1.1(b)(1)(I), the base offense level is increased by 16 because the value of the property obtained was more than $1,500,000 but less than $3,500,000.

iii.    Pursuant to Guideline § 2C1.1(b)(3), the base offense level is increased by 4 levels because the offense involved a public official in a high-level decision-making or sensitive position.

iv.    It is the government's position that pursuant to Guideline § 3C1.1, the base offense level is increased by 2 levels because the defendant attempted to obstruct justice with respect to the offense of conviction and relevant conduct. Defendant reserves the right to argue that this enhancement does not apply.

v.    Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for her criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for her actions within the meaning of Guideline § 3E1.1(a), including by furnishing the United States Attorney's Office

10

and the Probation Office with all requested financial information relevant to her ability to satisfy any fine or restitution that may be imposed in this case, a two-level reduction in the offense level is appropriate.

      vi.    In accord with Guideline § 3E1.1(b), defendant has timely notified the government of her intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

      c.    **Criminal History Category.** With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government, defendant's criminal history points equal zero and defendant's criminal history category is I.

      d.    **Anticipated Advisory Sentencing Guidelines Range.** Therefore, based on the facts now known to the government, it is the government's position that the anticipated offense level is 33, which, when combined with the anticipated criminal history category of I, results in an anticipated advisory sentencing guidelines range of 135 to 168 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose.

11

e.    Defendant and her attorney and the government acknowledge that the above guidelines calculations are preliminary in nature, and are non-binding predictions upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to conclude that different or additional guidelines provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw her plea on the basis of the Court's rejection of these calculations.

f.    Both parties expressly acknowledge that this Agreement is not governed by Fed. R. Crim. P. 11(c)(1)(B), and that errors in applying or interpreting any of the sentencing guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the guidelines. The validity of this Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw her plea, nor the government the right to vacate this Agreement, on the basis of such corrections.

12

## Cooperation

11.    Defendant agrees she will fully and truthfully cooperate in any matter in which she is called upon to cooperate by a representative of the United States Attorney's Office for the Northern District of Illinois. This cooperation shall include providing complete and truthful information in any investigation and pre-trial preparation and complete and truthful testimony in any criminal, civil, or administrative proceeding. Defendant agrees to the postponement of her sentencing until after the conclusion of her cooperation.

## Agreements Relating to Sentencing

12.    At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation. If the government determines that defendant has continued to provide full and truthful cooperation as required by this Agreement, then the government shall move the Court, pursuant to Guideline § 5K1.1, to depart downward from the low end of the applicable guideline range, and shall recommend a sentence that includes a term of imprisonment in the custody of the Bureau of Prisons of 66 percent of the low end of the applicable guideline range. Defendant shall be free to recommend any sentence. Defendant understands that the decision to depart from the applicable guideline range rests solely with the Court.

13.    If the government does not move the Court, pursuant to Guideline § 5K1.1, to depart from the applicable guideline range, as set forth above, the

preceding paragraph of this Agreement will be inoperative, both parties shall be free to recommend any sentence, and the Court shall impose a sentence taking into consideration the factors set forth in 18 U.S.C. § 3553(a) as well as the Sentencing Guidelines without any downward departure for cooperation pursuant to § 5K1.1. Defendant may not withdraw her plea of guilty because the government has failed to make a motion pursuant to Guideline § 5K1.1.

14.    It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw her guilty plea.

15.    Regarding restitution, defendant acknowledges that pursuant to Title 18, United States Code, Section 3663A, the Court must order defendant, together with any jointly liable co-defendants, to make full restitution to the Chicago Public Schools in an amount to be determined by the Court at sentencing, which amount shall reflect credit for any funds repaid prior to sentencing.

16.    Restitution shall be due immediately, and paid pursuant to a schedule to be set by the Court at sentencing. Defendant acknowledges that pursuant to Title 18, United States Code, Section 3664(k), she is required to notify the Court and the United States Attorney's Office of any material change in economic circumstances that might affect her ability to pay restitution.

17.     Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

18.     Defendant agrees that the United States may enforce collection of any fine or restitution imposed in this case pursuant to Title 18, United States Code, Sections 3572, 3613, and 3664(m), notwithstanding any payment schedule set by the Court.

19.     After sentence has been imposed on the count to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining counts of the indictment as to defendant.

### Acknowledgments and Waivers Regarding Plea of Guilty

#### Nature of Agreement

20.     This Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 15 CR 620.

21.     This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other

federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

### Waiver of Rights

22.     Defendant understands that by pleading guilty she surrenders certain rights, including the following:

      a.     **Trial rights.** Defendant has the right to persist in a plea of not guilty to the charges against her, and if she does, she would have the right to a public and speedy trial.

      i.     The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

      ii.     If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and her attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

      iii.     If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict her unless, after hearing all the evidence, it was persuaded of her guilt

16

beyond a reasonable doubt and that it was to consider each count of the indictment separately. The jury would have to agree unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

        iv.     If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

        v.     At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and her attorney would be able to cross-examine them.

        vi.     At a trial, defendant could present witnesses and other evidence in her own behalf. If the witnesses for defendant would not appear voluntarily, she could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

        b.     At a trial, defendant would have a privilege against self-incrimination so that she could decline to testify, and no inference of guilt could be drawn from her refusal to testify. If defendant desired to do so, she could testify in her own behalf.

        c.     **Waiver of appellate and collateral rights**. Defendant further understands she is waiving all appellate issues that might have been available if

17

she had exercised her right to trial. Defendant is aware that Title 28, United States Code, Section 1291, and Title 18, United States Code, Section 3742, afford a defendant the right to appeal her conviction and the sentence imposed. Acknowledging this, if the government makes a motion at sentencing for a downward departure pursuant to Guideline § 5K1.1, defendant knowingly waives the right to appeal her conviction, any pre-trial rulings by the Court, and any part of the sentence (or the manner in which that sentence was determined), including any term of imprisonment and fine within the maximums provided by law, and including any order of restitution, in exchange for the concessions made by the United States in this Agreement. In addition, if the government makes a motion at sentencing for a downward departure pursuant to Guideline § 5K1.1, defendant also waives her right to challenge her conviction and sentence, and the manner in which the sentence was determined, in any collateral attack or future challenge, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness or ineffective assistance of counsel, nor does it prohibit defendant from seeking a reduction of sentence based directly on a change in the law that is applicable to defendant and that, prior to the filing of defendant's request for relief, has been expressly made retroactive by an Act of Congress, the Supreme Court, or the United States Sentencing Commission.

23.     Defendant understands that by pleading guilty she is waiving all the rights set forth in the prior paragraphs. Defendant's attorney has explained those rights to her, and the consequences of her waiver of those rights.

### Presentence Investigation Report/Post-Sentence Supervision

24.     Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope, and extent of defendant's conduct regarding the charges against her, and related matters. The government will make known all matters in aggravation and mitigation relevant to sentencing, including the nature and extent of defendant's cooperation.

25.     Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of her financial circumstances, including her recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of her sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

26.     For the purpose of monitoring defendant's compliance with her obligations to pay a fine and restitution during any term of supervised release or probation to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release or probation to which defendant is sentenced. Defendant also agrees that a certified copy of this Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

## Other Terms

27.     Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine and restitution for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

28.     Defendant understands that, if convicted, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

<u>Conclusion</u>

29.     Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

30.     Defendant understands that her compliance with each part of this Agreement extends throughout the period of her sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event she violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

31.     Should the judge refuse to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound to it.

32. Defendant and her attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

33. Defendant acknowledges that she has read this Agreement and carefully reviewed each provision with her attorney. Defendant further acknowledges that she understands and voluntarily accepts each and every term and condition of this Agreement.


AGREED THIS DATE: _October 13, 2015_


_____
ZACHARY T. FARDON
United States Attorney

_____
MEGAN CUNNIFF CHURCH
LINDSAY JENKINS
Assistant U.S. Attorneys

_____
BARBARA BYRD-BENNETT
Defendant

_____
MICHAEL Y. SCUDDER, JR.
Attorney for Defendant