UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | No. 15 CR 620 |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| | ) | |
| BARBARA BYRD-BENNETT | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Dated: April 7, 2017

Respectfully submitted,
JOEL R. LEVIN
Acting United States Attorney

s/ Megan Cunniff Church
MEGAN CUNNIFF CHURCH
LINDSAY C. JENKINS
Assistant United States Attorneys
219 South Dearborn Street
Chicago, Illinois 60604
(312) 886-1173

For the record and so no one is blind-sided and my integrity preserved, I need you to know and to instant [*sic*] that prior to accepting my current position, I formally resigned my previous relationship with SUPES Academy.

There are several other businesses/companies who currently do work with CPS and with whom I have also served as a consultant. I also formally resigned from these businesses. I receive no financial benefit from their continued work with CPS, and they were assured that they would not be prohibited from future work with CPS. This was agreed upon by the Talent Office and City Hall prior to my acceptance of the current position I hold at the District.

I also hope you will make this clear to your direct reports. The insinuations are being [*sic*] more intolerable.

If I need to provide any greater clarification to anyone, please advise.

Thanks for you're [*sic*] cooperation.

Barbara

September 13, 2012 Email, attached as GV Exhibits 89.

Within months of joining CPS, Barbara Byrd-Bennett found it necessary to stamp out rumors of impropriety in her dealings with The SUPES Academy. She did not want her integrity impugned. She wanted the rumors to stop. She then sent that message down the chain of command at CPS. And it was all a lie. As Byrd-Bennett knew, she stood to benefit financially from contracts CPS awarded to the SUPES Academy and Synesi Associates. She ultimately expected to receive hundreds of thousands of dollars upon her return to SUPES for pushing CPS contracts to the SUPES Entities. She sold her integrity and sold out the students of the Chicago Public Schools, and then she worked to enrich herself and her co-schemers at the expense of CPS, its students, its teachers, its administrators, and the City of Chicago.

To account for Byrd-Bennett's corruption and greed, to send a clear message that corruption will not be tolerated at any level, most especially at the highest levels within government, and to recognize Byrd-Bennett's cooperation with the government's investigation, the government respectfully requests that the Court impose a sentence of 89 months' imprisonment, which is 66% of the low-end of the advisory Guidelines range.

## I.    Byrd-Bennett's Corrupt Scheme

When Byrd-Bennett accepted employment with CPS, first as a consultant and then as Chief Executive Officer, she did so knowing full-well the on-going struggles within CPS.   Like so many of the inner-city school districts in which Byrd-Bennett had worked during her long career within education, CPS faced countless challenges, from budget and financial woes, to student achievement and performance gaps, from teacher strikes and closing schools, to conflicts within and between teachers and administrators.   As a mentor and coach within The SUPES Academy's Chicago Executive Leadership Academy (CELA), Byrd-Bennett worked directly with and supported the highest-level officials within CPS.   She already had an insider's view of CPS before becoming a part of CPS.

That knowledge and unique perspective are aggravating circumstances when considered in the context of the corrupt scheme that Byrd-Bennett and Gary Solomon engineered: she knew her victims, she knew their weaknesses and struggles, and she chose to defraud them anyway.   As a consultant and then as CEO, Byrd-Bennett used her position to steer CPS contracts to Solomon, Thomas Vranas, and the SUPES Entities in exchange for bribes and kickbacks to be paid following her employment with CPS, ongoing benefits such as sporting event tickets, and future employment with the SUPES Entities with the expectation of a signing bonus.   Byrd-Bennett agreed to cheat

and deceive CPS from the get-go, to eliminate any opposition to her efforts to expand contracts for the SUPES Entities within CPS, and to line her pockets with money obtained from a cash-strapped school district through her fraud. The scheme succeeded: through the collective efforts of Byrd-Bennett, Solomon, and Vranas, the SUPES Entities received contracts with CPS totaling more than $22 million. Solomon and Vranas personally pocketed more than $2.9 million from the scheme.

### A.      The Consulting Agreement and CPS Contracts

In approximately December 2011, while Byrd-Bennett was working as a consultant for the SUPES Entities, Solomon and Vranas negotiated a Consulting Agreement with Byrd-Bennett. Pursuant to the terms of the Consulting Agreement, Solomon, Vranas, and the SUPES Entities agreed to compensate Byrd-Bennett with a percentage of the gross revenues of any contract awarded to the SUPES Entities if, among other things, Byrd-Bennett provided sales services for the contract. Vranas sent Byrd-Bennett several drafts of the Consulting Agreement by email. Although the general terms of the Consulting Agreement were settled by late January or early February 2012, Byrd-Bennett did not sign the compensation agreement until in or about April 2012.

Byrd-Bennett was under no illusion that she could legitimately maintain her consulting arrangement with the SUPES Entities when she joined CPS. In a series of emails with Solomon, she expressed her concerns about terminating her other lucrative consulting arrangements due to the potential conflicts of interest arising from her employment with CPS. As she told Solomon,

> The bottom line is that each has thought that I need to take a leave to avoid conflict of interests etc. [One company] is particularly concerned because they want to respond to the after's school RFP and they do 7-11 million with non

> public but the $ flow through CPS….Ugh!!!!  I have just reduced my income
> significantly and there is no telling what [another company's representative] will
> do and if I will be able to re-engage when I am done with CPS.  Oh well ……
> maybe the attorney's [*sic*] will figure out something and given there is ni [*sic*]
> written agreement, I need to figure out lot….Never a dull moment (:

April 27, 2012 Email, attached as GV Exhibits 38.  Byrd-Bennett knew, however, that her

arrangement with Solomon and the SUPES Entities was different.  Her place at the SUPES

Entities was secure.  As Solomon reassured her, "When this stint at CPS is done, and you are

ready to re re re retire, we have your spot waiting for you.   Hopefully, with even more work and

more opt."   April 29, 2012 Email at GV Exhibits 47.

Vranas signed the Consulting Agreement on behalf of himself, Solomon, and the SUPES

Entities on May 29, 2012, nearly a month after Byrd-Bennett's effective starting date as a

consultant with CPS.  Byrd-Bennett never disclosed this financial arrangement to CPS and, in

fact, was prohibited by the CPS Code of Ethics from having such a financial arrangement.   Based

on the terms of her undisclosed Consulting Agreement with the SUPES Entities, Byrd-Bennett

stood to gain as much as 10% of the revenues generated from the SUPES Entities' contracts with

CPS.  That was the general understanding of Byrd-Bennett, Solomon, and Vranas with respect to

the October 2012, $2.09 million contract and its extension: Byrd-Bennett was to receive $254,000

upon her return to the SUPES Entities.

The honest services fraud scheme did not end once the October 2012 contract was finalized.

Solomon, Vranas, and the SUPES Entities had promised to reward Byrd-Bennett for steering

contracts to the SUPES Entities.  While there was no explicit agreement as to the amount of

money Byrd-Bennett would receive for steering the $20.5 million contract to SUPES, that contract

was also part of the scheme to defraud and to obtain money and property from CPS through bribes

and kickbacks. Solomon, Vranas, and the SUPES Entities promised to give and gave Byrd-Bennett a flow of personal financial benefits in exchange for official actions to steer contracts to the SUPES Entities. Likewise, Byrd-Bennett's efforts to secure business at CPS for Synesi's school turn-around program and her pushing of Vendor A to sponsor CELA were part of the scheme to defraud.

On or about June 26, 2013, the CBOE awarded the $20.5 million sole-source contract to The SUPES Academy for leadership development services for CELA. On July 1, 2013, Byrd-Bennett emailed Solomon, stating, "Anything u can provide to me or a designated person relative to the future college and weddings for the boys might be helpful." GV Ex. at 99. Solomon, Vranas, and the SUPES Entities intended to compensate Byrd-Bennett for her assistance in securing this contract. In August of 2013, Byrd-Bennett emailed Solomon, "Have my contract ready (: [.]" GV Ex. at 111. Solomon responded, "Ready and waiting. Always on my desk."

## B. Byrd-Bennett Eliminated Opposition within CPS

As a high-level consultant and then CEO of CPS, Byrd-Bennett was uniquely positioned to ensure that the corrupt scheme succeeded. Her leadership role within CPS gave her authority to set goals and requirements for programs and training. *See, e.g.,* August 24, 2013 Email, attached as GV Exhibits 114 ("The CEO determined that principals should not be out of their buildings during the week to attend CELA sessions. This is why sessions are being held on Saturday. It is up to the CEO to determine how to respond to the complaints about Saturday sessions."). Her background within the education industry and with troubled inner-city school districts gave her credibility to diagnose problems and prescribe remedies. *See, e.g.,* June 14, 2012 email, attached as GV Exhibits 58 ("Let me also add that in my assessment the Chiefs

5

(current) also require much more work. If inward tom think of them as independent Superintendents leading a district with the autonomy CPS has declared, there are probably on 4-5, I would identify.").

Byrd-Bennett sharply rebuked challenges to her authority. *See, e.g.,* December 7, 2012 email, attached at GV Exhibits 100 ("At our meeting I will inform him [Steve Gering] that I am taking this over via Sherry!"). As the Court recognized at the sentencing of Gary Solomon, Byrd-Bennett effectively fired Gering when he voiced concerns within CPS about the $20.5 million contract.

Byrd-Bennett installed loyal friends in high-level positions within CPS. These friends supported Byrd-Bennett and her agenda. Solomon offered to help some of these friends find employment in exchange for deep principal professional development at CPS (GV Exhibits at 47). These friends accompanied Byrd-Bennett to dinners where they, too, were wined and dined by Solomon, Vranas, and the SUPES Entities.

And Byrd-Bennett actively lied about her relationship with the SUPES Entities to other CPS personnel: "Although I was instrumental in developing this tool [the Synesi Toolkit] and I know its value, you need to know that I am receiving no financial benefits from the potential engagement." August 28, 2012 Email at GV Exhibits 81.

Byrd-Bennett effectively conveyed to the Chicago Board of Education, CPS's procurement department, and the CPS employees who reported to her that she would only accept SUPES for leadership development and training; that the scope of SUPES's work must be expanded to a wider audience within CPS; that CPS was incapable of conducting the training itself or with other providers; and that she was acting in the best interests of CPS. She corrupted the process entirely.

She made it happen.   *See* December 2, 2012 Email at GV Exhibits at 94 ("I know we calculated PG and St. Louis….what is it for Chicago, assuming we hit the full amount?   And finally, this would be the same for Synesi when I make it happen, yes?").   No one other than her co-schemers understood the full scope of Byrd-Bennett's motivations for securing contracts with the SUPES Entities: college funds, wedding funds, a signing bonus, being the "highest paid person on the planet" on the day she returned to SUPES/Synesi, gifts, goodies, Target runs, "extermination"[1] checks, and lucrative employment as a consultant for the SUPES Entities, where she would make more money while doing less work.

### C.    Obstruction

In the summer of 2013, *Catalyst*, a news magazine that focuses on the Chicago Public Schools, published an article questioning the awarding of the $20.5 million, sole-source contract to SUPES.   The article drew attention to the relationship between Byrd-Bennett and the SUPES Entities.   Following that article, the CBOE Inspector General launched an investigation into the SUPES Entities' contracts with CPS.   Byrd-Bennett, Solomon, and Vranas were aware of the article and the investigation.   The Inspector General requested Byrd-Bennett's employment contract and compensation information from the SUPES Entities, as well as email correspondence regarding Byrd-Bennett.   In consultation with Solomon, Byrd-Bennett deleted her emails, emails

---

[1] In his proffer, Vranas explained that Byrd-Bennett had assembled a list of items she needed from a Target store.   Solomon obtained the items, which he and Vranas paid for, and then delivered them to Byrd-Bennett's driver.   Vranas also explained that Byrd-Bennett asked Solomon to acquire anti-surveillance equipment to debug her office because Jean Claude Brizard had believed that the mayor was listening to his conversations via a surveillance bug hidden within his (Brizard's) office.   Vranas purchased debugging equipment but never used it within Byrd-Bennett's office.

in which she and Solomon plotted to defraud CPS and to enrich themselves. She also understood that Solomon and Vranas were doing the same with their own emails.

On April 14, 2015, two FBI agents knocked on Byrd-Bennett's door at approximately the same time that searches of Byrd-Bennett's residence and the SUPES Entities were occurring. Byrd-Bennett agreed to speak to the agents, and then she proceeded to lie in response to nearly every question posed.

### D. Cooperation

Within a few weeks of her interview and the execution of the search warrants, Byrd-Bennett sought to cooperate with the government in its investigation. She agreed to participate in proffer-protected interviews with the U.S. Attorney's Office, the FBI, and the CBOE Inspector General. In her initial proffer, Byrd-Bennett minimized her conduct and was not entirely truthful. Thereafter, however, Byrd-Bennett participated in numerous proffer sessions in which she admitted her conduct and provided truthful information regarding her co-schemers and the honest services bribery and kickback scheme. She accepted full responsibility for her conduct. She provided truthful information regarding other areas of interest to the government and the Inspector General. At the government's request, Byrd-Bennett met with law enforcement from outside of the Northern District of Illinois. Byrd-Bennett also testified before the grand jury and truthfully admitted her conduct. She cooperated months before either Vranas or Solomon attempted cooperation. The government was able to investigate and ultimately resolve the full scope of criminal conduct at issue because of her timely and complete cooperation. She should receive the benefit of that cooperation.

8

Because of her truthful cooperation and substantial assistance, the government moves the Court to depart from the low-end of the advisory Guidelines range and impose a sentence of 66% of the low-end of the range.

## II.   Applicable Guidelines Range

The government agrees with the U.S. Probation Officer's calculation of the advisory Guidelines range for Byrd-Bennett.

With regard to paragraph 62 of the Presentence Investigation Report, the government agrees that the sixteen-level enhancement, pursuant to Guidelines §§ 2B1.1(b)(1)(I) and 2C1.1(b)(2), is appropriate because the value of the benefit received in return for the bribe was more than $1.5 million but less than $3,500,000.   The government disagrees with the Probation Officer's use of a calculation of 10% of the total value of all contracts at issue to arrive at that conclusion, however.   Instead and as supported by the evidence, the value of the benefit received in exchange for the bribe was approximately $2.9 million.   As set forth in the government's version of the offense, the SUPES Entities earned more than $10 million in profits from CPS in connection with honest services fraud scheme.   Solomon and Vranas received direct payments in connection with those contracts totaling more than $2.9 million.

Based on a total offense level of 33 and a criminal history category of I, the advisory range is 135 months to 168 months of imprisonment.   The government requests that the Court impose a sentence of 89 months' imprisonment, a sentence that is sufficient but not greater than necessary to accomplish the purposes of sentencing.

9

III. **For Byrd-Bennett, a Sentence of 89 Months' Imprisonment is Sufficient, But Not Greater Than Necessary, to Accomplish the Purposes Set Forth in The Guidelines and 18 U.S.C. § 3553(a).**

A. **Nature and Circumstances of the Offenses**

Within the City of Chicago, it is hard to conceive of an institution as important or serving a community as vulnerable as the Chicago Public Schools. Byrd-Bennett was hired to lead CPS, to start a new chapter in its efforts to educate Chicago's students. Instead, hers is yet another story in the long history of corruption, graft, and greed in Chicago.

Byrd-Bennett and her co-schemers not only deprived CPS of Byrd-Bennett's honest services, they undermined efforts to provide leadership and professional development training for CPS administrators, principals, and teachers – those who have the highest and most direct responsibility for educating CPS's students. They deprived other organizations and companies of the ability to develop and provide leadership and training programs tailored to CPS and its needs. They undermined other programs within CPS that lost funding in order to pay for the corrupt scheme. They called into doubt the independence and legitimacy of CPS's procurement process. They gave further reason for skeptics of CPS to question its needs, financial and otherwise, and its ability to provide for the needs of its students.

B. **History and Characteristics of the Defendant**

Byrd-Bennett is an unlikely criminal defendant. She is a beloved wife, mother, and grandmother. She is highly educated. She does not suffer from addictions and has no criminal history. She dedicated her life to public service, spending her career in public education. Because of her talents and abilities, she rose through the ranks of the public education system, garnering honorary degrees and accolades for her efforts in turning around struggling schools and

10

school districts. She retired after decades serving students and school districts. Her sentence must account for a career dedicated to helping students and improving school districts in the most challenging of circumstances.

Byrd-Bennett's motivations in coming to CPS as a consultant and then staying on as CEO were not simply financial or to burnish her credentials in leading a larger school district in a bigger city. She wanted to help CPS and its students. She truly believed in the leadership and professional development training offered by the SUPES Entities. She wanted to develop and motivate leadership within CPS in order to improve schools and the quality of education provided to students. She used her skills and expertise to lead CPS through numerous challenges, including a teacher strike, school closings, financial distress, and other emergencies. Trying to balance all of the complicated issues and diverse constituencies and interests involved in public education and within CPS, Byrd-Bennett worked to improve the quality of education for CPS's students. Her sentence must account for this.

Byrd-Bennett's sentence must also account for her greed. She did not need to take the job with the Chicago Public Schools, where she ultimately received an annual salary of $250,000. She did not need the money promised to her as part of the corrupt scheme. She was financially secure, celebrated, and successful. She had multiple pensions. She had developed her own consulting business, allowing her to earn hundreds of thousands in additional compensation from school districts and organizations that looked to her expertise in education. She knew better than to use her official position for private benefits. She had countless people to turn to for advice and support. She should never have become a criminal defendant, but she ultimately made numerous

11

decisions that led her to stand before the Court for sentencing, decisions that were rooted in greed. Her sentence must account for all of this.

## C.    Additional § 3553(a) Factors

A sentence of 89 months' imprisonment is sufficient but not greater than necessary to account for all of the goals of sentencing.    Such a sentence reflects the seriousness of the offense, promotes respect for the law, and provides just punishment.    It provides general deterrence, and it avoids unwarranted sentencing disparities.

### 1.    Seriousness of the Offense, Respect for the Law, Just Punishment, and Deterrence

Public corruption undermines the legitimacy of government, the public servants who dedicate their lives and careers for the betterment of their communities, and the services provided by those public servants.    Byrd-Bennett, as the high-level public official, owed CPS, its students, and the City of Chicago her loyalty, her honesty, and her hard work.    As the leader of the Chicago Public Schools, she had the greatest responsibility to make decisions for the best interests of CPS and its students.    Instead, she made decisions for her own benefit and to enrich herself and her co-schemers at the expense of CPS and Chicago taxpayers.

Byrd-Bennett, along with Solomon, Vranas, and the SUPES Entities, made a series of rational, calculated decisions to defraud CPS.    Like so many other defendants in white collar and public corruption cases, they weighed the risks and rewards of the scheme before deciding to gamble with the prospect of becoming rich.    They plotted to limit the risks by promising payments to Byrd-Bennett only after she returned to the SUPES Entities following her employment with CPS.    Their corruption was sophisticated, and it was nearly undetectable.    Even after an investigation was underway into their corruption, they did their best to further limit the risks of

12

being caught and being held fully accountable: they deleted emails and continued to lie.

The inherent difficulty in detecting and successfully prosecuting public corruption offenses necessitates significant sentences for those individuals caught committing such offenses; who justify their corruption as the cost of doing business in state and local government throughout Illinois; and who obstruct investigations of their wrongdoing. Byrd-Bennett is unfortunately one more defendant in the long line of high-level public officials who chose to defraud those they promised to serve. The significant sentences that those high-level public officials received did not deter Byrd-Bennett, but there is hope that her sentence will deter other public officials from choosing fraud and greed over honesty and loyalty to those they serve.

2.      Sentencing Disparities

A sentence of 89 month's imprisonment does not create unwarranted sentencing disparities between Byrd-Bennett and her co-defendants. The Court recently sentenced Gary Solomon to a term of imprisonment of 84 months. Byrd-Bennett, whose advisory Guidelines range is higher than Solomon's due to her position as a public official, was equally culpable with Solomon in terms of the execution of the scheme. They plotted together, and they brought Vranas into the scheme. She is more culpable, however, in that she was the public official who was required to make decisions for the best interests of CPS and its students. A sentence of 89 months' imprisonment accounts for her cooperation, her full acceptance of responsibility, and the aggravating nature of her role and conduct as the public official.

Similarly, the government intends to recommend a sentence of 39 months' imprisonment for Vranas, which sentence is warranted under the circumstances presented. Like Byrd-Bennett, Vranas cooperated with the government and fully accepted responsibility for his conduct. He

13

substantially assisted the government in its investigation, and he should receive the benefit of that cooperation.    Vranas was not involved in the corrupt scheme from the beginning, as Byrd-Bennett and Solomon kept their corrupt agreement between themselves.    Vranas later came to understand the full scope of the corruption, joined and helped accomplish the scheme, and then profited handsomely as a result, receiving millions of dollars.    His recommended sentence accurately reflects his relative culpability and position, as compared with Byrd-Bennett and Solomon, as well as his cooperation.

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, the government respectfully requests that the Court impose a sentence of 89 months' imprisonment for Byrd-Bennett.

14